**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| **DEBRA CORBELLO**, | § |
| | § |
| Plaintiff, | § |
| | § |
| v. | §      Civil Action No. **3:10-CV-1835-L** |
| | § |
| **SEDGWICK CLAIMS MANAGEMENT** | § |
| **SERVICES, INC.,** | § |
| | § |
| Defendant. | § |

## MEMORANDUM OPINION AND ORDER

Before the court is Defendant Sedgwick Claims Management Services, Inc.'s Motion for Summary Judgment, filed August 15, 2011; Plaintiff's Motion for Summary Judgment, filed August 15, 2011; Defendant Sedgwick Claims Management Services, Inc.'s Motion to Strike Plaintiff's Surreply, filed October 14, 2011; Defendant Sedgwick Claims Management Services, Inc.'s Motion for Leave to File Supplemental Authority, filed October 31, 2011; and Plaintiff's Motion for Leave to Respond to New Arguments Raised in Defendant's Reply, filed December 5, 2011.  After carefully considering the motions, evidence, record, and applicable law, the court **grants** Defendant Sedgwick Claims Management Services, Inc.'s Motion for Summary Judgment and **denies** Plaintiff's Motion for Summary Judgment.  The court also **grants** Defendant Sedgwick Claims Management Services, Inc.'s Motion to Strike Plaintiff's Surreply and **denies as moot** Defendant Sedgwick Claims Management Services, Inc.'s Motion  for Leave to File Supplemental Authority and Plaintiff's Motion for Leave to Respond to New Arguments Raised in Defendant's Reply.

## I.      Background

Plaintiff Debra Cobello ("Corbello" or "Plaintiff") originally filed this action on August 18, 2010, in County Court at Law No. 2, Dallas County, Texas, against Defendant Sedgwick Claims Management Services, Inc. ("Sedgwick"), alleging that Sedgwick wrongfully denied her claim for disability benefits under ERISA.[1]   Corbello seeks to recover payment for wrongfully denied disability benefits, attorney's fees, costs, and interest at the maximum allowable rate.  Sedgwick removed the action to federal court on September 14, 2010, based on federal question jurisdiction.

Corbello began working as a dispatcher at Southwestern Bell Telephone Company ("SWBT") in April 2008.  Corbello's job functions as a dispatcher are sedentary in nature and include sitting, typing, and talking.[2]  Def.'s App. 4.  As a SWBT employee, Corbello was a participant in AT&T DIP, a program that provides qualified employees benefits, including short-term and long-term disability benefits.  After being employed by SWBT for one year, Corbello made a claim for short-term disability benefits under the AT&T DIP for the period of time between April 17, 2009, to July 17, 2009.  Corbello claims that she was disabled during this time because she suffered from panic disorder with agoraphobia[3] and adjustment disorder with mixed anxiety and depressed mood.

---

[1] Because Plaintiff's Original Petition (referred to hereafter as "Complaint") does not specifically identify the claims Corbello is asserting, there was some uncertainty on Sedgwick's part as to whether Corbello was asserting a claim for breach of fiduciary duty under ERISA; however, Corbello clarified in her response to Sedgwick's summary judgment motion that she is only asserting a claim for wrongful denial of benefits.  Pl.'s Resp. 30.  Accordingly, Sedgwick's argument regarding breach of fiduciary duty is moot, and the court will not address it.

[2] Corbello contends that her duties as dispatcher also included mandatory overtime, but the only evidence of this appears to be Corbello's statements to her treating physicians and the persons handling her claim.  *See, e.g.*, Def.'s App. 8-9 (Corbello states, "[s]he has been on mandatory overtime at work . . . [and] almost broke down at work.").

[3] Agoraphobia is "[a] phobia to open or public places."  The American Heritage Stedman's Medical Dictionary 25 (1995).

Corbello contends that the high anxiety and stress that she suffered at the time was brought on as a result of verbal threats by a co-worker,[4] followed by a three-hour meeting with management. Corbello's medical records indicate that the incident with the co-worker occurred on March 29, 2009. Corbello appears to also contend that working mandatory overtime contributed to her alleged condition.

According to Corbello, she attempted to go to work on April 17, 2009, but as she was leaving home she began crying uncontrollably due to the aforementioned stressors. She contacted her physician, Dr. George Sandusky ("Dr. Sandusky"), who specializes in internal medicine. Dr. Sandusky telephoned a prescription of Xanax to Corbello's pharmacy and advised her to see a therapist. Based on Dr. Sandusky's advice, Corbello saw Dr. Linda Davis ("Dr. Davis"), a licensed psychologist, on April 21, 2009. The following notation appears in two places in Dr. Davis's first report dated April 21, 2009:

> NOTE: Dr. Davis is never the "treating doctor" for medical decisions and/or medical treatment, including taking patient off work or release to return to work. Please DO NOT contact Dr. Davis for these matters, contact patient's PCP or identified "Treating M.D. or D.O."

Def.'s App. 266 and 268.

On April 22, 2009, after seeing Dr. Davis, Corbello contacted her employer about disability benefits, and reported being emotional and having elevated blood pressure and panic attacks brought on by a "very stressful few weeks." Def.'s App. 5-6. Her employer explained that "[c]laims without medical information supporting a complete inability to perform [your] AT&T . . . assigned job duties

---

[4] According to the business records kept by Sedgwick, Corbello reported that the co-worker who allegedly threatened her was her supervisor and that the supervisor's threats at work included yelling at her to get on the phone. Def.'s App. 24.

. . . will be denied." *Id.* at 6.   Corbello's claim was handled by third-party administrator Sedgwick, who was responsible for handling all claims for disability benefits under the AT&T DIP, as well as related appeals.   Judy Neal was assigned to handle Corbello's claim.

From April 24, 2009, to July 17, 2009, Corbello continued to see Dr. Davis for counseling sessions.   Dr. Davis noted that Corbello was sad, worried, depressed, anxious, and tearful.   In a June 10, 2009 report for the period of April 22, 2009, to June 10, 2009,[5] Dr. Davis noted as follows under diagnostic information "Primary - 300.21 (Panic Dis w/Agoraphobia)."   This appears to be the only reference in Corbello's records to agoraphobia.   No details regarding Dr. Davis's diagnosis of agoraphobia or Corbello's condition in this regard are noted in this or any other report by Dr. Davis; nor is there any reference to symptoms reported by Corbello other than general stress and anxiety. Despite the diagnosis of agoraphobia, Dr. Davis indicated that Corbello was nevertheless able to drive and had been to the grocery store, and although Corbello had been staying home a lot, she reported no difficulty in running errands or attending her doctor's appointments.   Def.'s App. 158.

Dr. Davis also described Corbello's mental condition as depression and adjustment disorder with mixed anxiety and depressed mood and indicated an "AXIS V: Current GAF" score of 45.[6]  *Id.* She described Corbello's day to day functioning as "Pt's anxiety + panic [indecipherable] → staying @ home most of time – out for Drs' visits + some errands.   Physically probably able to perform ADL's, but depression + anxiety are very inhibiting." *Id.*  She further described Corbello's current

---

[5] The reports of the consulting experts used by Sedgwick refer to this progress report by Dr. Davis as being for the period of April 21, 2009, to June 11, 2009.  *See* Def.'s App. 179, 182, and 184.  The difference in dates appears to be a simple typographical error.

[6] GAF is an acronym for Global Assessment of Functioning.

treatment plan as "Management of anxiety; [indecipherable] techniques; destress from [indecipherable]; stress management skills + assertiveness training + physician supervised medication." *Id.* In addition, Dr. Davis noted that "Treating doctor [Dr. Sandusky] authorizes RTW + hrs + restrictions. Ck w/ Dr. George Sandusky. I recommend considering 1/2 days initially + gradually move to combination 1/2 + full days; then to full week BUT NO MANDATORY OVERTIME w/o Dr. Sandusky's Permission." *Id.*

During this time, Corbello also visited Dr. Sandusky on April 27, 2009 and continued to see him through July 17, 2009. In an April 27, 2009 report, Dr. Sandusky noted that Corbello had nausea and diarrhea, that she was "very anxious" and "totally stressed" from working mandatory overtime and from being threatened at work. Pl.'s App. 93. Dr. Sandusky diagnosed or assessed Corbello has having issues with her weight, allergies, multiple stresses, and depression but described Corbello's condition as "Stable." *Id.* at 96. Based on an examination, Dr. Sandusky further concluded that Corbello's overall physical and psychiatric condition was "Normal" except for the gastrointestinal and constitutional symptoms noted. *Id.* at 93-94. With regard to her "Mental Status," Dr. Sandusky concluded that Corbello's behavior, language, attention, mood, cognitive ability, memory, speech, and orientation were all "Normal." *Id.* at 94. Dr. Sandusky's report indicates that Corbello was prescribed Xanax and Lexapro to treat her reported psychiatric symptoms of stress and anxiety.

On June 15, 2009, Dr. Sandusky reported that Corbello was "better" despite her slightly elevated blood pressure and need to lose weight. Dr. Sandusky again concluded that Corbello's physical and psychiatric condition or mental status were all "Normal" and "Stable" despite

continuing issues with weight, allergies, anxiety and depression.  Although Dr. Sandusky determined concluded that Corbello's condition was normal and stable, he noted under "Treatment Plans": "RTN to work July 6 1/2 days to start + no mandatory overtime."  *Id*. at 89-92.

Dr. Sandusky's July 1, 2009 report indicates that Corbello was "stressed" but again described her physical and psychiatric condition or mental status as "Normal" and "Stable."  *Id*. at 85-88.  The report further indicates that "she [Corbello] wants to extend time off at least 2 wks."  *Id*. at 85.  Apparently based on this request by Corbello, Dr. Sandusky concluded: "Extend Disability - til 20th of July."

On July 17, 2009, Dr. Sandusky completed an AT&T form in which he described Corbello's condition for the period of April 17, 2009, to July 17, 2009 as "severe anxiety."  *Id*. at 97.  In response to the question "Date(s) patient has been ill or incapacitated," he wrote April 17, 2009, to July 17, 2009.  *Id*.  Despite these assessments, he responded "None" to the question "Based on the employee's job title 'DISPATCHER [CWA-SBCIS]' and the employee's description of his/her job functions, please list the job functions he/she is unable to perform."  *Id.*  In another report on this same day, he also reported, as he had done before, that Corbello's overall condition was "Normal" and "Stable."  *Id*. at 81-84.

The following day, Corbello returned to work without restrictions.  By this time, her claim for disability benefits had been denied, and the denial was upheld on appeal. Before denying Corbello's claim, Sedgwick referred her medical records to two physician advisors, including a physician who was board certified in psychiatry.  Def.'s App. 13-19. Sedgwick asked the physicians to advise whether Corbello's medical records supported her claim that she was unable "to perform

her occupational assignments (sitting, typing, talking) from 4/24/09 and forward." Def.'s App. 14. The physician advisors were further requested to advise whether Corbello's medical records supported her "ability to return to work with restrictions." *Id.* Sedgwick also notified Drs. Sandusky and Davis that Corbello's claim was being referred to physician advisors and attempted to schedule a telephone conference with them and the physician advisors. Dr. Sandusky declined to participate, and it appears that Dr. Davis never responded to Sedgwick's request to schedule a telephone conference.

Both physician advisors concluded that Corbello's medical records did not support her alleged inability to perform the duties of her job without restrictions. *Id.* at 16 and 18. On May 7, 2009, after reviewing the physician advisors' reports, Sedgwick's contacted Corbello to inform her that the medical information submitted did not support her claim for disability benefits. Sedgwick suggested to Corbello that she should "submit documentation from the treating provider explaining why she is not able to perform the essential duties of her occupation and what her functional impairment is as it relates to her diagnosis." Def.'s App. 21. On May 8, 2009, in response to an inquiry by Corbello asking what documentation was needed to support her claim, Sedgwick advised that documentation "supporting objectiving [sic] med info, current symptoms and OV notes to support entire denied time." *Id.* at 22.

No further documentation by Corbello was provided at this time, and Sedgwick sent Corbello a letter on May 12, 2009, formally notifying that her claim had been denied. Pl.'s App. 123-24. Sedgwick indicated in the letter that its decision was based on its review and assessment of medical records provided by Dr. Sandusky on April 27, 2009, and additional materials received from Dr.

Davis on May 11, 2009. Sedgwick explained that "[f]or your claim to qualify for disability benefits,

we would need clear documentation from your provider(s) on why you are not able to perform the

essential duties of your occupation." *Id.* at 124. Sedgwick further noted that the "[c]linical

information does document a severity of your condition(s) that supports your inability to perform

your occupation as DISPATCHER [CWA-SBCIS] from April 24, 2009 through your return of

work." *Id.* Sedgwick's denial letter included the definitions of disability from the SPD:

> "Total Disability" or "Totally Disabled" for short-term disability means that
> because of illness or injury, you are unable to perform all of the essential functions
> of your job.
>
> "Partial Disability" or "Partially Disabled" for short-term disability means
> that because of illness or injury, you are unable to perform all of the essential
> functions of your job

*Id.* at 123. Attached to Sedgwick's denial letter was a Quality Review Unit Appeal Form, which

instructed:

> If you are including medical evidence in your appeal, you or your treatment provider
> must submit the following:
>
> • A clear outline of your level of functionality
> • A description of how your level of functionality impacts your ability to work
>   and perform your daily activities
> • A detailed description of the treatment provider's rationale for your level of
>   functionality
> • Clinical documentation that supports the treatment provider's rationale

Def.'s App. 106.

By letter dated May 11, 2009, Corbello indicated her intent to appeal the denial of her claim,

arguing that:

> Contrary to your description of my work as sedentary, it is very stressful with
> management and directors screaming through out the call center, irate customers on

the phone, frequent changes, unresolved payroll errors from January 2009 resulting in me not receiving all income due to me with managers continuing to say they are checking on the issue without any resolution to day, my manager being out on leave due to stress, mandatory overtime since last summer resulting in most weeks being 50+ hours as well as having a co-worker recently make a death threat towards me. After months of the day to day stresses of the workplace environment, unresolved payroll due to me and the death threat without support of management, the stresses finally were more than my body could handle.

Def.'s App. 86.  Corbello further stated that she had been seeing Drs. Sandusky and Davis and that Dr. Davis had informed her that she had acute anxiety with depression, and Dr. Sandusky had prescribed Lexapro for anxiety and depression.  Corbello noted that she also had "high blood pressure, irritable bowel syndrome, nausea, fatigue, exhaustion, excessive sleep patterns and lack of concentration which are all normal signs of anxiety and depression." *Id.*  She further indicated that Dr. Sandusky had informed her that it takes a few weeks for the Lexapro to take effect but that "I feel that I am on the path to recovery and returning to work as quickly as possible.  I am trying to adjust to the medications as well as lower my blood pressure before returning to the stresses of the workplace environment.  I am working with Dr. Linda Davis on techniques to relieve and deal with stress and anxiety . . .[and] would appreciate you reconsidering my disability claim as I am truly attempting to deal with the medical issues and return to work as quickly as possible." *Id.*

Corbello filed a formal appeal on or about May 13, 2009.  In support of her appeal, Corbello submitted Dr. Sandusky's April 27, 2009 report and the April 21, 2009 report from Dr. Davis.  She also submitted an initial call message that was written by a woman named Liz at Dr. Sandusky's office.  The call message describes Corbello as "crying uncontrollably" and "under a lot of stress." *Id.* at 128.

On June 2, 2009, Corbello's appeal was assigned to Angela Molina ("Molina"). During Molina's first telephone call with Corbello, she reviewed with Corbello the medical information that Sedgwick had received to date and stated that any information submitted by Corbello would be reviewed. Molina briefly explained that disability criteria included observable findings by Corbello's treating physicians of impairment that supported a conclusion that she was unable to perform the duties of her job. Def.'s App. 35.

During this same call, Corbello confirmed that her treating physicians were Drs. Sandusky, Davis, and Kristina Bailey, who Corbello believed was a dermatologist.[7] Corbello's visit to the dermatologist was for an unrelated matter involving the removal of a mole. Out of an abundance of caution, Molina recommended that Corbello also provide the medical records from Bailey. Molina advised that after receiving confirmation from Corbello that her file was complete, Sedgwick would process her appeal. Molina also advised Corbello that Sedgwick would be attempting again to contact her treating physicians.

Subsequently on June 15 and 17, 2009, Sedgwick received additional records from Drs. Davis and Sandusky. In forwarding the June 15 materials from Dr. Sandusky, Corbello noted in a letter to Sedgwick: "[a]s you will see in his notes he has shown a return to work date of July 6, 2009." Def.'s App. 163. In light of a notation in Dr. Davis's records that Corbello could return to work with restrictions and limitations, Molina contacted Corbello and explained that if she needed restrictions or other accommodations, she should open a job accommodation claim so a specialist could determine if any such restrictions or limitations were medically supported. Corbello

---

[7] It was subsequently determined that Bailey is not a physician but instead a physician's assistant. Def.'s App. 182.

acknowledged she previously had been advised that she would need to submit a job accommodation claim. It does not appear that Corbello ever opened a job accommodation claim before returning to work.

On or about this same time, Corbello requested and was given an extension to June 29, 2009, to submit materials in support of her appeal. Def.'s App. 40 and 175. On June 18, 2009, Corbello advised Molina that all additional medical information in support of her appeal had been submitted. Def.'s App. 43-44. In response to an inquiry by Corbello, Molina indicated that a determination regarding the appeal would be made by July 14, 2009. On the same day, Molina forwarded Corbello's file to three physician advisors: Dr. Kenneth J. Marks ("Dr. Marks"), a board certified psychiatrist, Dr. Gary Markewich ("Dr. Markewich"), a board certified dermatologist, and Dr. John Leddy ("Dr. Leddy"), a board certified internist.

Dr. Marks telephoned and spoke with Dr. Sandusky on June 24, 2009. Dr. Sandusky stated that he felt that Corbello could return to work on a part-time basis and this should have happened in May. *Id.* at 179. Sandusky further stated that he was not a psychiatrist and therefore had no objective psychiatric information as to why Corbello needed psychiatric disability. *Id.* Dr. Marks also telephoned and left a message for Dr. Davis, but she did not return his call. After reviewing Corbello's medical records, Dr. Marks concluded in his report:

> **PSYCHIATRY SYNOPSIS**: This is a dispatcher for DIP. Her LDW was 04/16/09 and her disability began on 04/20/09. There is no RTW date. She is claiming disability secondary to depression and seborrheic dermatitis. This chart is fully reviewed and all of the notes from all of the providers are read and appreciated. The following is noted: On 04/17/09 and on 04/21/09, Dr. Davis, PH.D, notes that she is complaining of stress on the job and can't concentrate. She is noted to be sad, depressed and has reported crying at work. She is noted to be well groomed, has

intact and coherent thoughts, has good insight and judgment, is not suicidal, homicidal, psychotic, and delusional and is A&O x 3. Dr. Davis referrers [sic] questions re: ability to work, etc, to Dr. Sandusky. On 04/27/09, Dr. Sandusky writes that she has nausea and diarrhea and is working mandatory overtime and was also threatened at work. He notes that she is stressed and anxious. Her PE is essentially benign and his Dx of [sic] is HTN and IBS. The psychiatric symptoms reported by Dr. Davis and Dr. Sandusky appear to be subjective complaints and these psychiatric symptoms are not objectively noted by Dr. Davis or by Dr. Sandusky. In all of the notes reviewed, there are no objectively noted signs or symptoms of any type of psychiatric decompensation, using standard techniques of measurement, that show cognitive impairment, that demonstrate that she is psychiatrically disabled.

**IN ANSWER TO YOUR SPECIFIC QUESTIONS:**

1.      **Is the employee disabled from her regular job as of 04/24/09 through present?**

The employee is not disabled from her regular job as of 04/24/09 through present.

2.      **If disabled, what is/are the disabling diagnoses and complicating factors/comorbidities?**

She is not psychiatrically disabled and there are no disabling diagnoses and complicating factors/comorbidities.

3.      **If disabled, what is the rationale or basis for the disability?**

She is not psychiatrically disabled and there is no rationale or basis for any disability.

4.      **Please discuss all clinical findings and how they have impaired the claimant's ability to function at her job.**

There are no objectively noted signs or symptoms of any type of psychiatric disability or objective clinical findings contained in the medical record that would impact her ability to function at her job.

. . .

She does have complaints and Dx's on Axis III and if she were to be considered for disability, it would be secondary to her Axis III conditions and not secondary to any

Axis I condition.  From a psychiatry perspective, the employee is not disabled from
her regular job as of 04/24/09 through present.

Def.'s App. 179-80.  Upon review of Corbello's medical records, Drs. Leddy and Markewich

similarly concluded that while the medical records reveal that she has had multiple medical

problems, mainly associated with stress and anxiety, they do not support a finding that she is

disabled from performing her job during the time in question.  *Id.* at 182-85.

By letter dated July 14, 2009, Sedgwick notified Corbello that the denial of her claim for

short-term disability benefits had been upheld on appeal after all of the medical information provided

was reviewed by Sedgwick and independent physician advisors Drs. Marks, Leddy, and Markewich.

Pl.'s App. 132-33.  Like the May 12, 2009 letter denying Corbello's claim, this letter included a

definition of "Total Disability" or "Totally Disabled."  *Id.* at 132.  The letter also summarized Drs.

Marks's, Markewich's, and Leddy's assessments of Corbello's medical information and their

conclusions regarding her disability claim.

The letter noted Dr. Marks's telephone conference with Dr. Sandusky and states: "[i]n review

of all of the information provided Dr. Marks stated that there is no objectively noted signs or

symptoms of any type of psychiatric decompensation resulting in a cognitive impairment that would

prevent you from performing your job duties for the time period under review."  *Id.*  at 132-33.  The

letter notes that Dr. Markewich concluded that none of the dermatological findings "would be

disabling." *Id.* at 133.  With regard to Dr. Leddy, the letter states:

In review of all of the available information Dr. Leddy observed that there was mild
elevation of your blood pressure noted in the April examination.  He reviewed that
this had normalized by June.  Additionally, he noted that the only treatment you have
received is for anxiety and depression [not blood pressure].  Therefore, he concluded

> that the clinical findings did not support your inability to perform your job duties for
> the time period under review.

*Id*.  The letter concludes by summarizing that "[a]lthough some findings are referenced, none are

documented to be so severe as to prevent you from performing the duties of your job as Dispatcher,

with or without reasonable accommodation."  *Id*.  The letter also notes that Sedgwick's decision on

appeal was final.

On July 21, 2009, Corbello requested copies of all documents, records, and other information

relevant to her claim.  Def.'s App. 191.  On July 24, 2009, Corbello's attorney requested copies of

materials referred to in Sedgwick's July 14, 2009 letter, as well as other information related to the

denial of Corbello's claim.  By letter dated August 10, 2009, Sedgwick confirmed that it had

received the July 24, 2009 correspondence from Corbello's attorney and again noted that its

determination as to Corbello's claim was final.  On August 11, 2009, Sedgwick also confirmed

receiving Corbello's request for information relevant to her claim and advised that copies would be

provided within 14 to 21 days.  The following year on May 21, 2010, Corbello's attorney wrote to

Sedgwick again, seeking reconsideration of its decision based on documents already in Corbello's

administrative record, as well as additional information that Corbello submitted in conjunction with

her request for reconsideration.  By letter dated July 22, 2010, Sedgwick acknowledged receiving

Corbello's May 21, 2010 correspondence but reiterated that its July 14, 2009 decision was final and

advised Corbello that she had the right to bring suit under ERISA after exhausting the appeal

procedures set forth in the plan procedures.

## II.        Summary Judgment Standard

Summary judgment shall be granted when the record shows that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986); *Ragas v. Tennessee Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).  A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  When ruling on a motion for summary judgment, the court is required to view all facts and inferences in the light most favorable to the nonmoving party and resolve all disputed facts in favor of the nonmoving party.  *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005).  Further, a court "may not make credibility determinations or weigh the evidence" in ruling on motion for summary judgment.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254-55.

Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine dispute of material fact.  *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).  Mere conclusory allegations are not competent summary judgment evidence, and thus are insufficient to defeat a motion for summary judgment. *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996).  Unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence.  *See Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir.), *cert. denied*, 513 U.S. 871 (1994).  The party opposing summary judgment is required to identify specific evidence in the record and to articulate

the precise manner in which that evidence supports his claim. *Ragas*, 136 F.3d at 458. Rule 56 does not impose a duty on the court to "sift through the record in search of evidence" to support the nonmovant's opposition to the motion for summary judgment. *Id.*; *see also Skotak v. Tenneco Resins, Inc.*, 953 F.2d 909, 915-16 & n.7 (5th Cir.), *cert. denied*, 506 U.S. 832 (1992). "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. Disputed fact issues that are "irrelevant and unnecessary" will not be considered by a court in ruling on a summary judgment motion. *Id.* If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

### III.   Sedgwick's Summary Judgment Motion - Wrongful Denial of Benefits Under ERISA

Both parties moved for summary judgment. Both motions deal with Corbello's only claim for wrongful denial of benefits under ERISA. Because Sedgwick's summary judgment motion is dispositive of Corbello's wrongful denial of benefits claim, the court first addresses it in its analysis. The court's ruling on this motion therefore affects whether Plaintiff's summary judgment motion should be granted.

In ERISA cases, when "the language of the plan grants discretion to an administrator to interpret the plan and determine eligibility for benefits, a court will reverse an administrator's decision only for abuse of discretion." *High v. E–Systems, Inc.*, 459 F.3d 573, 576 (5th Cir. 2006). Similarly, when the plan administrator is given authority to make a final determination of eligibility for claim benefits, its denial of benefits is reviewed for an abuse of discretion. *See Duhon v. Texaco*,

Inc., 15 F.3d 1302, 1305 (5th Cir. 1994); *see also Gosselink v. AT & T, Inc.*, 272 F.3d 722, 726 (5th

Cir. 2001). "A plan administrator abuses its discretion where the decision is not 'based on evidence,

even if disputable, that clearly supports the basis for its denial.'" *Holland v. International Paper Co.*

*Ret. Plan*, 576 F.3d 240, 246 (5th Cir. 2009) (quoting *Vega v. National Life Ins. Servs., Inc.*, 188

F.3d 287, 299 (5th Cir. 1999)) (en banc), *abrogated on other grounds by Metropolitan Life Ins. v.*

*Glenn*, 554 U.S. 105 (2008). Under the abuse of discretion standard, "[i]f the plan fiduciary's

decision is supported by substantial evidence and is not arbitrary and capricious, it must prevail."

*Ellis v. Liberty Life Assurance Co.*, 394 F.3d 262, 273 (5th Cir. 2004). "Substantial evidence is more

than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might

accept as adequate to support a conclusion." *Id.* (quotation omitted). "An arbitrary decision is one

made without a rational connection between the known facts and the decision or between the found

facts and the evidence." *Bellaire Gen. Hosp. v. Blue Cross Blue Shield*, 97 F.3d 822, 828 (5th Cir.

1996). The court's "review of the administrator's decision need not be particularly complex or

technical; it need only assure that the administrator's decision fall somewhere on a continuum of

reasonableness—even if on the low end." *Holland*, 576 F.3d at 247 (quoting *Corry v. Liberty Life*

*Assurance Co.*, 499 F.3d 389, 398 (5th Cir. 2007)).

"Eligibility for benefits under any ERISA plan is governed by the plain meaning of the plan

language." *Tucker v. Shreveport Transit Mgmt. Inc.*, 226 F .3d 394, 398 (5th Cir. 2000) (quoting

*Threadgill v. Prudential Sec. Grp., Inc.*, 145 F.3d 286, 292 (5th Cir. 1998)). Plan terms are

interpreted in accordance with their "ordinary and popular sense as would a person of average

intelligence and experience." *Crowell v. Shell Oil Co.*, 541 F.3d 295, 314 (5th Cir. 2008) (citations

omitted).  Thus, the terms are constructed as they would likely be "understood by the average plan participant, consistent with the statutory language."  *Id.* (citations omitted).  When reviewing an administrator's interpretation of plan terms for an abuse of discretion, the doctrine of *contra proferentem*, which provides that ambiguous terms are construed in favor of the insured, does not apply.  *E–Systems, Inc.*, 459 F.3d at 578-79; *see also Rhorer v. Raytheon Eng'rs and Constructors, Inc.*, 181 F.3d 634, 642 (5th Cir. 1999); *Dunn v. GE Grp. Life Assurance Co.*, 289 F. App'x 778, 780-81 (5th Cir. 2008).  Rather, the plan administrator may exercise "interpretive discretion" when construing ambiguous terms in ERISA plans.  *E–Systems, Inc.*, 459 F.3d at 579.

In evaluating a plan administrator's denial of benefits under an abuse of discretion standard, the court generally performs a two-step inquiry.  *Holland*, 576 F.3d at 246 n.2 (citations omitted). The court first considers whether the administrator's decision was legally correct.  *Id.*  If legally correct, the court's inquiry is complete, as there is no abuse of discretion.  *Id.*  If legally incorrect, the court proceeds to the second step to analyze the  plan administrator's denial of benefits for an abuse of discretion.  *Id.*  The court, however, is not limited to this test and may skip the first step if it can "readily determine that the decision was not an abuse of discretion."  *Id.*; *see also E–Systems, Inc.*, 459 F.3d at 577.  In this case, the court does not consider whether the decision was legally correct and instead proceeds to the abuse of discretion inquiry; however, because the parties argue at length regarding the applicability of the doctrine of *contra proferentem* whether the language in the plan or summary plan description ("SPD") is ambiguous, the court first addresses this issue.

### A.       The Doctrine of *Contra Proferentem* is Inapplicable

In response to Sedgwick's motion, Corbello argues that the SPD is ambiguous and any ambiguity must be resolved in her favor under the doctrine of *contra proferentem*.   Corbello contends that the doctrine of *contra proferentem* applies because Sedgwick's July 14, 2009 letter denying Corbello's request for reconsideration is based on the lack of objective evidence of Corbello's disability, whereas the SPD only requires that she substantiate her claim with "Medical Documentation."   Corbello also contends that the term "satisfactory documentation" in the SPD is ambiguous, and Sedgwick is attempting improperly to increase her burden by requiring objective evidence or documentation that she was disabled.   For the same reason, Corbello objects to Sedgwick's and Dr. Marks's reference to "disabled" and contends that it was improper for Sedgwick to use this as the standard in denying her claim because the SPD only requires that a claim be supported by "Medical Documentation," not evidence that she was disabled.

Corbello's assertion that the SPD is ambiguous and, therefore, the rule of *contra proferentem* should apply is without merit.   Eligibility for benefits under an ERISA plan is first governed by the plain meaning of the language of the contract. *Threadgill*, 145 F.3d at 292. "Only when the plan terms remain ambiguous after applying ordinary principles of contract interpretation does [the] court apply the rule of *contra proferentem* and construe the terms strictly in favor of the insured." *See E–Systems*, *Inc.*, 459 F.3d at 579; *Wegner v. Standard Ins. Co.*, 129 F.3d 814, 818 (5th Cir. 1997). As previously noted, however, the administrator is given discretion to interpret the plan, and it is also empowered to resolve any such ambiguity.

This case does not warrant application of the rule of *contra proferentem* because the language of the SPD is not ambiguous, and even if it were, the SPD gives Sedgwick total discretion to interpret the SPD. The SPD at issue provides that it "is the official document of the AT&T Disability Income Program ('the Program') . . . [and] will govern and be the final authority on the terms of the Program." *Id.* at 512. The SPD also gives Sedgwick as the plan administrator total discretion to interpret the provisions of AT&T's Disability Program as set forth in the SPD, as well as determine whether an employee qualifies for disability benefits under the Program:

> Only the Claims Administrator has the discretion to determine whether you have a disability that qualifies you for Short-Term Disability Benefits under the Program.
>
> . . .
>
> Plan Administrator. AT&T Inc. The Plan Administrator has the sole and absolute discretion to interpret the provisions of the Program, make findings of fact, determine the rights and status of participants and others under the Program, and decide disputes under the Program. The Plan Administrator may delegate any of its duties or powers. To the extent permitted by law, such interpretations, findings, determinations and decisions will be final and conclusive on all persons for all purposes of the Program.

Def.'s App. 521 and 549. Consequently, even if an ambiguity existed in the SPD, Sedgwick's denial of Corbello's claim is reviewed under the abuse of discretion standard, not the doctrine of *contra proferentem*.

Corbello's contentions regarding alleged ambiguities in the SPD are similarly without merit. The SPD specifically states that to be eligible for disability benefits, an employee must be totally or partially disabled. Def.'s App. 520. The plain language of the SPD indicates that to be eligible for total or partial disability benefits, an eligible employee must be "unable to perform all of the essential

functions of [her] job."  Def.'s App. 520 and 547-48.  There is nothing ambiguous about this requirement.  Sedgwick's initial and final denials of Corbello's claim for disability benefits likewise state that the denial of Corbello's disability claim was based on its determination that there was insufficient evidence that Corbello was unable to perform the essential duties or functions of her occupation as a dispatcher with or without reasonable accommodations.  Pl.'s App. 123-24 and 132-33.  Thus, the court rejects Corbello's objection to Sedgwick's use of the term "disabled" in denying her claim for benefits, as well as her contention that the SPD is not written in a manner calculated to be understood by the average plan participant.

Additionally, Corbello's argument that the SPD requires evidence of "satisfactory documentation" is taken entirely out of context.  The only reference to "satisfactory Medical Documentation" that the court was able to locate in the SPD appears in a section that states "[i]n order to be considered for Short-Term Disability Benefits under the Program, you must [among other things] . . . [b]e under the care of a Physician and follow his or her recommended treatment plan. The Claims Administrator will require that you *periodically furnish satisfactory Medical Documentation of your disability from your Physician*."  Def.'s App.  521.  The paragraph also states that an employee may be required to report for a medical examination "if the Claim Administrator requires this examination to continue your Short-Term Disability Benefits." *Id.*  Thus, this paragraph refers not only to initial eligibility for disability benefits but also ongoing conditions for an employee to *continue* receiving disability benefits.

Moreover, this paragraph is not inconsistent with the SPD's definition of "Medical Documentation":

> Information used by the Claims Administrator to determine whether an Eligible Employee is eligible for benefits under the Program. Such information *includes, but is not limited to*, medical, psychiatric or psychological opinion from the treating or reviewing Physician that is supported by diagnostic tools and examinations, which are performed in accordance with the generally accepted principals [sic] of the health care profession.

*Id.* at 547 (emphasis added). When the SPD is read as a whole, it is clear that regardless of the type or amount of medical documentation submitted in support of a claim, it must establish that an employee is disabled, that is, the employee must be unable to perform the essential functions of her job. Notably, Corbello does not contend that the term "Medical Documentation" is ambiguous; in fact, she relies on this definition in arguing that the materials she submitted in support of her disability claim were sufficient without more. Her contention that the SPD is ambiguous based on its reference to satisfactory medical documentation is therefore without merit.

Corbello's assertion that the SPD is ambiguous because it does not include the term "objective" is similarly without merit. Corbello fails to cite any authority or explain why the non-inclusion of the term "objective" in the SPD makes it ambiguous. The cases relied on by Corbello simply state that ambiguities in a summary plan description are treated the same as ambiguities in a plan, and when there is a discrepancy between the description and plan, the description controls. Here, the SPD is not ambiguous and there is no allegation that it varies from any underlying policy or plan. Moreover, Corbello's argument that Sedgwick's interpretation of the SPD is legally

incorrect because it required objective verification of Corbello's functional limitations does not create an ambiguity in the SPD.[8]  The doctrine of *contra proferentem* therefore does not apply.

### B.      Denial of Benefits Was Not an Abuse of Discretion

Sedgwick contends that it is entitled to summary judgment because its denial of Corbello's claim for disability benefits is supported by substantial evidence and is rationally connected to Corbello's medical records and the opinions of the three specialists that Sedgwick retained to review and analyze the medical records on appeal.  Corbello counters that Sedgwick is not entitled to summary judgment because it did not address and negate all of the contentions in her twenty-nine page Complaint regarding Sedgwick's improper denial of her disability claim.

Corbello asserts a number of reasons for her belief that Sedgwick improperly denied her claim for disability benefits.  For example, Corbello contends that Sedgwick ignored references to "severe," "agoraphobia," and certain other matters in her medical records that are not specifically referenced in Sedgwick's July 14, 2009 letter or Dr. Marks's report.  Corbello therefore contends that Sedgwick and the specialists retained by Sedgwick failed to consider or did not give proper weight to her medical records and subjective symptoms that support a finding of disability, and instead relied solely on the opinions of the specialists retained by Sedgwick in denying her appeal.

---

[8] Corbello's argument is further undercut by the Fifth Circuit's opinion in *Anderson* where the court concluded that it is not an abuse of discretion for an administrator to request and insist on objective evidence that complained of illnesses or symptoms rendered the employee unable to work. *Anderson*, 619 F.3d 514-15 ("Without some objective measurement of Anderson's functional limitations, Cytec had no way to determine whether his concentration was impaired to the point that he could not perform his job . . . .").  Like *Anderson*, Corbello was told that she would need to submit documentation supporting her alleged disability and inability to perform the essential duties of her job, including objective medical information, and she was given an opportunity to submit such information.

Contrary to Corbello's assertion, the record reflects that Sedgwick considered all of the materials submitted in deciding Corbello's appeal.  Indeed, Sedgwick's July 14, 2009, letter upholding the denial of Corbello's claim specifically states that all of Corbello's medical information provided by Drs. Sandusky and Davis, and Kristina Bailey for the period of April 17, 2009, to June 15, 2009, which included the subjective symptoms reported by Corbello, was reviewed by Sedgwick and the three independent physicians retained by Sedgwick.  Dr. Marks stated in his report that he fully reviewed and appreciated all of the records and notes from all of Corbello's treating physicians. Def.'s App. 179.  Drs. Markewich and Leddy likewise reviewed all of Corbello's medical records. Each of the three independent physicians concluded that none of the documented findings by Corbello's treating physicians was so severe as to prevent Corbello from performing her duties as dispatcher, with or without reasonable accommodation during the time in question.  The court therefore concludes that Sedgwick did not fail to consider relevant evidence, even though Sedgwick's denial letter and the reports of Drs. Marks, Markewich, and Leddy do not specifically reference or list every subjective symptom reported by Corbello.

The court also rejects Corbello's contention that Sedgwick did not give proper weight to her treating physicians' notations and related diagnoses regarding her subjective symptoms.  Corbello argues that the agoraphobia and GAF score reported by Dr. Davis and her description of Corbello's functional status as "severe" support her claim for disability benefits; however, Dr. Davis noted that Corbello could drive, run errands, go to the grocery store and doctor's appointments without difficulty despite having been diagnosed with panic disorder with agoraphobia.  Furthermore, there

is nothing in her medical records to suggest that this alleged condition prevented her from performing the essential functions of her job.

Corbello's contentions regarding Dr. Davis's findings are further undercut by her own argument and acknowledgment that Dr. Davis was never her "treating doctor" for purposes of deciding whether and when she could or could not work. Pl's Resp. 8. Instead, Dr. Davis deferred to Dr. Sandusky, who she identified as Corbello's "Treating M.D. or D.O." *Id.* Although Dr. Sandusky was her treating doctor, he indicated that he was not qualified to give an opinion regarding Corbello's psychiatric disability because he was not a psychiatrist.[9]

Moreover, while Dr. Sandusky noted during Corbello's first visit on April 27, 2009, that she reported being "totally stressed" and "very anxious" as a result of working mandatory overtime and being threatened at work, he concluded in this and all of his reports that her overall functioning was normal and stable. Pl.'s App. 93-96. This initial report says nothing regarding Corbello's ability or inability to perform her job duties as a dispatcher. Corbello also asserts that Dr. Sandusky found her to be "incapacitated" from April 17, 2009 to July 17, 2009, but in reality as noted by Sedgwick, he simply filled out an AT&T form and provided these dates in response to the question "6. Date(s) patient has been ill or incapacitated." Pl.'s App. 97. More notably, he wrote "None" in response to the next question on the same questionnaire: "7. Based on the employee's job title 'DISPATCHER

---

[9] Corbello objects to this evidence as hearsay and contends that Sedgwick should not have considered it in deciding her claim and appeal. The court determines that Dr. Sandusky's telephone conversation with Dr. Marks, as noted in Dr. Marks's report and other business records maintained by Sedgwick, and Sedgwick's consideration of this evidence does not affect the court's conclusion that Sedgwick's decision to deny Corbello's claim was not an abuse of discretion given his determination that her condition was normal/stable and did not prevent her from performing the essential functions of her job as dispatcher.

[CWA-SBCIS]' and the employee's description of his/her job functions, please list the job functions he/she is unable to perform."[10]  *Id.*

Even assuming as Corbello contends that Dr. Marks's and Sedgwick's determination conflicts with that of her treating doctors as reflected in her medical records, the law in this circuit is clear that "the job of weighing valid, conflicting professional medical opinions is not the job of the courts; that job has been given to the administrators of ERISA plans."  *Corry*, 499 F.3d at 401 (quoting *Gothard v. Metropolitan Life Ins. Co.*, 491 F.3d 246, 249-50 (5th Cir. 2007) ("[P]lan fiduciaries are allowed to adopt one of two competing medical views, a rule which resolves this appeal in favor of [the administrator]. . . . [The administrator's] decision may not be correct, but we cannot say that it was arbitrary.").  The court only reviews "for abuse of this discretion that has been given to the administrator."  *Corry*, 499 F.3d at 401.

Here, Sedgwick and the three physicians retained by Sedgwick, considered all of the evidence Corbello provided in support of her claim.  As noted, Corbello's records contain conflicting evidence and do not necessarily support a finding that she was disabled as defined by the SPD.  Drs. Marks,

---

[10] The parties dispute whether references by Dr. Davis and Dr. Sandusky to Corbello returning to work part-time is evidence of disability or her ability to work.  Corbello contends that this evidence supports her claim for disability benefits.  On the other hand, she contends that the court cannot consider Sedgwick's "new" argument regarding Corbello's ability to work part-time because it was not a basis for Sedgwick's final denial of her claim.  In light of Corbello's admission that Dr. Davis was not her treating doctor and the inconsistencies in the records maintained by Dr. Sandusky, the court does not believe it is necessary to undertake a detailed discussion of the parties' arguments since it does not change the outcome of the court's analysis and conclusion.  As previously noted, Dr. Sandusky's conclusion in this regard appears to be based at least in part on Corbello's request to extend her leave.  Additionally, based on Corbello's medical records, including the references to mandatory overtime, Dr. Marks and Dr. Sandusky both concluded that her reported symptoms and condition did not prevent her from performing the functions of her job as dispatcher during the time in question.

Markewich, and Leddy therefore all concluded that her mental and physical condition during the time in question was not so severe as to prevent her from performing her duties as dispatcher.

Moreover, even if her records had contained more compelling evidence, Sedgwick was not obligated to accept the  the opinions of Corbello's physicians as conclusive given the three qualified medical experts who found no objective medical evidence of disability.  *See id.*  In a "battle of the experts," Sedgwick as the plan administrator had discretion to choose one side over the other.  *Id.*; *see also Black & Decker Disability Plan v. Nord*, 538 U.S. 882, 831 (2003) (plan administrators not obliged to accord special deference to the opinions of treating physicians); *Gothard*, 491 F.3d at 249-50 ("An administrator does not abuse its discretion when it relies on the medical opinion of a consulting physician whose opinion conflicts with the claimant's treating physician . . . even if the consulting physician only reviews medical records and never physically examines the claimant.").  Thus, even if Sedgwick gave more weight to the opinions of Drs. Marks, Markewich, and Leddy than Corbello's treating physicians, this does not constitute an abuse of discretion.   The court therefore disagrees with Corbello's assertion that Sedgwick's evaluation and consideration of Corbello's claim was arbitrary and capricious and not rationally connected to the evidence.

The court further concludes that Sedgwick 's denial of disability benefits is supported by substantial evidence.  In sum, Corbello argues that her claim is substantiated by her substantial evidence and Sedgwick abused its discretion in concluding otherwise.  Corbello also appears to contend that to prevail on its motion, Sedgwick was required to address and disprove all of her arguments and the evidence that she contends supports her claim of disability.

Contrary to Corbello's assertions, Sedgwick has no such burden under ERISA.  Applicable law "requires only that substantial evidence support a plan [administrator's] decisions, including those to deny or to terminate benefits, not that substantial evidence (or, for that matter, even a preponderance) exists to support the employee's claim of disability." *See Ellis*, 394 F.3d at 273; *Corry*, 499 F.3d at 402.  Additionally, as previously explained, "an administrator does not abuse its discretion by relying on the medical opinions of its consulting physicians instead of the medical opinions of a claimant's treating physicians." *Id.*  There is "no law that requires a district court to rule in favor of an ERISA plaintiff merely because [she] has supported [her] claim with substantial evidence, or even with a preponderance. If the plan fiduciary's decision is supported by substantial evidence and is not arbitrary and capricious, it must prevail." *Ellis*, 394 F.3d at 273.

Each of the three physicians retained by Sedgwick concluded, based on Corbello's medical records, that she did not have a disability that prevented her from performing the duties of her job as a dispatcher.  Accordingly, the court concludes that the opinions of the three consulting physicians constitute substantial evidence (more than a scintilla) in support of Sedgwick's determination that Corbello did not have a disability that made her unable to perform the functions of her job during the time in question.  *Id.*  Thus, Sedgwick did not abuse its discretion in denying Corbello's claim for benefits.

## C.       Consideration of Additional Materials

It is not entirely clear from Corbello's briefing, but it appears that she contends that Sedgwick was required under *Vega v. National Life Insurance Services, Inc.*, 188 F.3d 287 (5th Cir. 1999), but refused to consider the additional materials that she submitted on May, 21, 2010, approximately ten

months after the appeal and final denial of her claim on July 14, 2009.  *Id.* at 300.[11]  Alternatively,

it appears Corbello contends that *Vega* requires the court to consider these additional materials even

if Sedgwick did not.  *Id.*  According to Corbello, allowing a claimant to submit additional

documentation to the plan administrator prior to suit prevents a self-interested administrator like

Sedgwick from manipulating the process unfairly by closing the record prematurely and excluding

information that would weigh in favor of the claimant.  Corbello contends that Sedgwick is self-

interested because it received a flat fee for processing Corbello's claim.

      Sedgwick in response focuses on the length of Corbello's delay in submitting the additional

materials after Sedgwick had processed Corbello's appeal and notified her that the decision was

final.  Sedgwick notes that it gave Corbello multiple extensions of time to submit her medical

records and did not process Corbello's appeal until after she confirmed on June 25, 2009, that her

file was complete.  Sedgwick also maintains that *Vega* is not settled law and has been brought into

question by a number of courts in this Circuit.

      For support, Sedgwick relies on *Anderson v. Cytec Industries Inc.*, 619 F. 3d 505, 516 & n.9

(5th Cir. 2010), where the court recognized that "[s]ubsequent panels of this court and several district

courts within the circuit have wrestled with this language from *Vega*, which could be read to allow

claimants to add material to the administrative record long after exhausting their final administrative

appeal" but declined to address the "thorny timing issues posed by *Vega*."  *Id.*  Sedgwick also cites

---

    [11] *Vega* held that "the administrative record consists of relevant information made available to the
administrator prior to the complainant's filing of a lawsuit and in a manner that gives the administrator a fair
opportunity to consider it."  *Id.*  The court reasoned that "[b]efore filing suit, the claimant's lawyer can add
additional evidence to the administrative record simply by submitting it to the administrator in a manner that
gives the administrator a fair opportunity to consider it."  *Id.*

*Shaikh v. Liberty Life Assurance* Company, Civ. A. No. H-08-0204, 2010 WL 2710606 (S.D. Tex.

July 6, 2010), in which the court discussed similar concerns regarding *Vega*, including those raised

by the Fifth Circuit in *Keele v. JP Morgan Chase Long Term Disability Plan*:

> In *Keele*, the court noted that to the extent *Vega* allowed the administrative record to be supplemented after the final administrative decision was reached, it was inconsistent with prior circuit authority. Citing a district court opinion, the court observed that such an interpretation of *Vega* would also cause practical problems for both plan administrators and reviewing courts. Such an approach would mean that a plan administrator might abuse its discretion by failing to reconsider its decision each time a new document was submitted and a request for review was made and that an administrator might not ever be able to close its claim file. Such an approach would also mean that a court would not know whether it could, consistent with abuse of discretion review, consider later filed evidence that the plan administrator had not been able to consider.

*See id.* at *14 (internal citations omitted) (citing *Keele v. JP Morgan Chase Long Term Disability*

*Plan*, 221 F. App'x 316, 319-21 (5th Cir. 2007)) (not designated for publication).  In response to

Sedgwick's timeliness argument, Corbello counters that she "could <u>not</u> have rebutted Dr. Marks's

opinions, or Sedgwick's reliance thereon, until such matter were made known . . . in Sedgwick's

final denial letter."  Pl.'s Reply 24 (emphasis in original).

When conducting an abuse of discretion review of a denial of benefits based on an

administrative record, this Circuit has generally required that the scope of review be limited to facts

known to the plan administrator at the time of the benefits decision.  *See Robinson v. Aetna Life Ins.*

*Co.*, 443 F.3d 389, 395 n. 3 (5th Cir. 2006); *Southern Farm Bureau Life Ins. Co. v. Moore*, 993 F.2d

98, 102 (5th Cir. 1993).  Certain limited exceptions to this rule have been recognized and relate to

either interpreting the plan or explaining medical terms and procedures relating to the claim.  *Vega*,

188 F.3d at 299; *see also Wildbur v. ARCO Chem. Co.*, 974 F.2d 631, 639 & n.15 (5th Cir. 1992)

(compiling cases). Evidence, including expert opinion, that assists the district court in understanding the medical terminology or practice related to a claim is similarly admissible. The Fifth Circuit has been clear, however, that "the district court is precluded from receiving evidence to resolve disputed material facts – i.e., a fact the administrator relied on to resolve the merits of the claim itself." *Vega*, 188 F.3d at 299.

In *Keele*, the court noted that the Fifth Circuit had not yet interpreted what was meant in *Vega* by "in a manner that gives the administrator a fair opportunity to consider it." *Keele*, 221 F. App'x at 320. *Keele* reasoned that this language could be construed one of two ways. It could be construed to refer to the amount of time between the administrative decision and the submission of additional evidence. Alternatively, it could be interpreted to refer to "the length of time between the claimant's submission of the new evidence and subsequent filing of suit in federal court." *Keele* concluded that the latter interpretation "is consistent with the overriding concern of *Vega*, which was to "encourage the parties to resolve their dispute at the administrator's level." *Id.* (quoting *Vega*, 188 F.3d at 300). Subsequently, the court in *Corry* concluded without much elaboration that the claimaint's additional evidence was within the administrative record because she had submitted the evidence to the plan administrator more than one year before filing a lawsuit, and as a result, the plan administrator had a "fair opportunity" to consider the evidence. *Corry*, 499 F.3d at 399, n.12.[12]

The court determines that Corbello's contentions regarding her submission of additional evidence does not change the result in this case. There is no evidence to support Corbello's bare

_____

[12] In *Corry*, the claimant submitted her additional evidence for consideration approximately seven months after the administrator's initial decision became final, and no appeal was taken.

assertion that Sedgwick is somehow "self-interested" or has a conflict of interest.[13]   Moreover, while Corbello provides pages and pages of legal authority to support her argument that the court may consider additional materials presented to the plan administrator in support of her claim prior to filing suit, she fails to identify specifically which materials were submitted to Sedgwick but not considered.   Regardless, Corbello concedes that many of the additional materials she submitted "were already included in the administrative record."  Pl.'s Reply 19 & n.6.

Based on the court's comparison of the materials that Corbello admits were already in the record and her attorney's May 21, 2010 letter to Sedgwick listing and enclosing materials for consideration, it appears that the only new or additional materials submitted were those consisting of printouts of publicly available information that Corbello or her attorney located on the internet, including materials discussing Lexapro and other drugs, adjustment and panic disorder symptoms, and the legal definition for "Star Chamber."  *See* Def.'s App. 485-507.  Corbello's reference to medical records in her May 21, 2010 letter, however, suggests that the materials may not have been limited to evidence interpreting the plan or explaining medical terms and procedures.  If additional medical records were submitted to resolve disputed material facts, that is, a fact that Sedgwick relied on to resolve the merits of Corbello's claim, the court cannot consider the evidence.  *Vega*, 188 F.3d at 299.

---

[13] The Declaration of Susan Hagestad submitted by Sedgwick further undercuts Corbello's assertion that Sedgwick is not disinterested.  Hagestad states that Sedgwick is an independent third party under contract with AT&T Inc. to administer claims and appeals filed under the AT&T DIP.  She also states that Sedgwick is not an affiliate of AT&T and has no role in funding any approved claims. Def.'s App. 2. Although she confirms as contended by Corbello that Sedgwick receives a flat fee without regard to whether it approves or denies claims, this evidence supports a finding of no conflict as to Sedgwick, and Corbello cites no authority to the contrary.

More importantly, Corbello fails to explain how or why these additional materials demonstrate that Sedgwick abused its discretion in denying her claim for disability benefits. Thus, the significance of these unidentified materials is a mystery. Consequently, even assuming arguendo that the materials submitted could have been part of the administrative record, the court does not deviate from its holding because no abuse of discretion has been shown. As no genuine dispute of material fact has been raised regarding abuse of discretion on the part of Sedgwick in denying Corbello's claim for benefits, Sedgwick is entitled to judgment as a matter of law.

## IV.    Plaintiff's Motion for Partial Summary Judgment

The court has considered Plaintiff's Motion for Summary Judgment simultaneously with Sedgwick's summary judgment motion. In doing so, it necessarily considered the arguments and evidence presented by both parties, as the evidence and legal issues overlap. In making its decision on the motions, the court concluded that Sedgwick's motion should be granted. Accordingly, granting Corbello's motion would be inconsistent with the rulings herein made, and the court will **deny** Plaintiff's Motion for Partial Summary Judgment.

## V.    Miscellaneous Motions

Without seeking or obtaining leave of court and without conferring with opposing counsel, Corbello filed a twenty-four page surreply in opposition to Sedgwick's summary judgment motion. Corbello then proceeded to file a twenty-three page response to Sedgwick's five-page motion to strike the surreply. In response to Sedgwick's two- page motion to file supplemental authority based on a recent unpublished opinion from this district, Corbello filed an eleven-page response. In an

attempt to get the last word, Corbello then proceeded to file a twenty-page motion for leave to file a surreply in opposition to Sedgwick's motion to file supplemental authority.

Corbello accuses Sedgwick of "laying behind the log," but after reviewing the materials submitted by the parties, the court disagrees.  All three motions filed by the parties deal in substantial part with the applicability of the doctrine of *contra preferentem*.  As the movant, Sedgwick was entitled to address in its replies any contentions raised in Corbello's responsive briefs, even if doing so required citation to additional legal authority.  Accordingly, the court rejects Corbello's assertion that it was necessary for her to file these voluminous materials to address what she refers to as "new arguments" by Sedgwick.  Moreover, contrary to Corbello's contention, she had fair notice regarding the issue of whether the doctrine of *contra proferentem* applied in this case and had the opportunity to brief extensively the issue.  Indeed, Corbello first raised the issue in her Complaint and again in her summary judgment motion.  Moreover, she also alluded to it in her response to Sedgwick's summary judgment motion and devoted a significant portion of her reply in support of her own summary judgment motion to the issue.

Neither the local rules of this court nor the Federal Rules of Civil Procedure allow a party to file a surreply as a matter of right.  Corbello acknowledges this in her Response to Defendant's Motion for Summary Judgment.  *See* Pl.'s Resp. 16, n.1.  Moreover, the scheduling order entered in this case specifically notes that surreplies are "highly disfavored" and admonishes the parties against using surreplies in a strategic effort to have the last word on a matter.  The voluminous materials filed by Corbello have unnecessarily delayed the resolution of the parties' dispositive motions and were not particularly helpful.  For all of these reasons, the court **grants** Defendant

Sedgwick Claims Management Services, Inc.'s Motion to Strike Plaintiff's Surreply (Doc. 22), and **directs** the clerk of the court to **strike** from the record Plaintiff's Surreply in Response to New Arguments Raised in Defendant's Reply (Doc. 21).

The court also **denies as moot** Defendant Sedgwick Claims Management Services, Inc.'s Motion for Leave to File Supplemental Authority (Doc. 25) and Plaintiff's Motion for Leave to Respond to New Arguments Raised in Defendant's Reply (Doc. 32).   The court has reviewed the case that Sedgwick sought to bring to the court's attention (*Dudley v. Sedgwick Claims Management Services*, No. 3:11-CV-0028, 2011 WL 5080739 (N.D. Tex. Oct. 24, 2011)) and the parties' related briefing, and finds that it does not change the result of the court's ruling on the parties' summary judgment motions.

## VI.    Conclusion

For the reasons herein stated, the court determines that no genuine dispute of material fact exists regarding Corbello's claim for wrongful denial of disability benefits under ERISA. Accordingly, the court **grants** Defendant Sedgwick Claims Management Services, Inc.'s Motion for Summary Judgment; **denies** Plaintiff's Motion for Summary Judgment; and **dismisses with prejudice** Corbello's claim for wrongful denial of disability benefits under ERISA.   The court also **grants** Defendant Sedgwick Claims Management Services, Inc.'s Motion to Strike Plaintiff's Surreply and **denies as moot** Defendant Sedgwick Claims Management Services, Inc.'s Motion for Leave to File Supplemental Authority; and Plaintiff's Motion for Leave to Respond to New Arguments Raised in Defendant's Reply.   The court will issue a judgment by separate document pursuant to Rule 58 of the Federal Rules of Civil Procedure.

**It is so ordered** this 7th day of March, 2012.


Sam A. Lindsay
United States District Judge